**Troy DOUD, Appellant (Defendant),**

**v.**

**STATE of Wyoming, Appellee (Plaintiff).**

**No. 92–107.**

Supreme Court of Wyoming.

Jan. 22, 1993.

Leonard D. Munker, State Public Defender, Gerald M. Gallivan, Defender Aid Program, Mike Matthews, Student Intern for the Defender Aid Program, and Thomas A. Thompson, Student Director of the Defender Aid Program, for appellant.

Joseph B. Meyer, Atty. Gen., Sylvia Lee Hackl, Deputy Atty. Gen., Barbara L. Boyer, Sr. Asst. Atty. Gen., Michael Pauling, Sr. Asst. Atty. Gen., Theodore E. Lauer, Director of the Prosecution Assistance Program, and C. Allan Perkins, Student Intern for the Prosecution Assistance Program, for appellee.

Before MACY, C.J., and THOMAS, CARDINE, URBIGKIT and GOLDEN, JJ.

MACY, Chief Justice.

Appellant Troy Doud appeals from his convictions for kidnapping in violation of Wyo.Stat. § 6–2–201(a)(iii) (1988) and for battery in violation of Wyo.Stat. § 6–2–501(b) (1988).

We affirm.

Appellant presents the following issues for our consideration:

 I. Whether there was insufficient evidence to support a finding that the Appellant unlawfully confined the victim within the appropriate meaning of Wyo. Stat. § 6–2–201(a)(iii)?

 II. Whether there was insufficient evidence to support a finding of the Appellant[ ]'s intent to inflict injury or terrorize?

 III. Even if the Court finds that Appellant could have been convicted under Wyo.Stat. § 6–2–201, whether the conviction must be remanded in light of the undisputed evidence showing the presence of the mitigating factors that would require a resentencing?

When reviewing the sufficiency of the evidence for a criminal conviction:

> "[T]his court must determine whether, after viewing the evidence and appropriate inferences in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime to have been proven beyond a reasonable doubt."

*Jennings v. State,* 806 P.2d 1299, 1302 (Wyo.1991) (quoting *Munson v. State,* 770 P.2d 1093, 1095 (Wyo.1989)). After we have properly resolved conflicts in the evi-

dence in favor of the prosecution, the record reveals:

Appellant and the victim were married for six years. During that time, they had a daughter. In March 1991, the victim sought a divorce and moved out of the marital home. Appellant retained primary custody of their daughter while the victim had custody of her on every other weekend. According to their custody arrangement, the victim was to keep her daughter over the weekend of April 13th and 14th. On Friday, April 12th, the victim called Appellant to tell him that the roads were closed due to a blizzard and that she would be unable to pick up their daughter. On Saturday, she attempted to contact Appellant twice but succeeded in reaching only his answering machine. The victim spent Saturday night with Roy Underwood, the man with whom she had recently become romantically involved. Finally, on Sunday morning, she successfully contacted Appellant. He told her to pick up their daughter because he wanted to leave for California on a business trip. After talking to Appellant, the victim borrowed a truck from Mr. Underwood's friend and went to pick up her daughter at Appellant's house.

Appellant was distraught because he suspected that the victim spent the night with Mr. Underwood. He positioned himself along the route between the Underwood house and his house to verify whether in fact the victim was coming from Mr. Underwood's house. When the victim drove past Appellant's position, he pulled out behind her and followed her to his house. As she pulled into his driveway, Appellant cut in front of her, forcing her to stop. Appellant got out of his vehicle and began verbally abusing the victim. A physical altercation ensued inside the victim's truck in which Appellant struck her with his fist. The victim attempted to get out on the passenger's side, but Appellant ran around and pushed her back into the truck. In the course of their struggle, Appellant dropped a 9 mm Beretta hand gun he had been carrying. When the victim saw the gun, she stopped fighting.

At this point, Appellant told the victim to drive, which she refused to do. Appellant got into the pickup on the driver's side, placed the gun on the dashboard, and started driving toward town. As they were driving, Appellant informed the victim for the first time that their daughter was not at his house but was at his parents' house. Appellant drove by his parents' house twice but never stopped to pick up their daughter. While he was driving, Appellant told the victim that, if he could not have her, nobody could and that she could either come back to him or die. The victim informed Appellant at one point that they needed to stop for gas. Appellant responded: " 'Well, I guess we'll just drive until we run out of gas, and then I'll kill you and I'll kill myself.' " Appellant's threats continued throughout the time he was driving.

Appellant eventually drove back to his house. Appellant's hired hand, Richard Errington, was in the yard when they arrived. The victim started screaming to Mr. Errington that she needed help and that Appellant had a gun. She ran toward Mr. Errington, but Appellant caught up with her and started dragging her toward the house. Mr. Errington told Appellant not to hurt her or he would be in trouble. Mr. Errington explained during the trial that he did not do anything more than verbally warn Appellant because he worked for Appellant and was reluctant to interfere. Once in the house, the victim succeeded in getting the gun away from Appellant, and she threw it out of the house and onto the deck. Appellant retrieved the gun and brought it inside.

Appellant's mood became increasingly unpredictable while he kept the victim in the house. At one point, he made the victim remove her clothes so that he could ascertain whether she had had sex with Mr. Underwood. Later, Appellant gave the gun to the victim and told her that the only way she could leave him would be if she were to shoot him. When she refused to shoot him, he took the gun from her, sat on her chest, held the cocked gun to her head, and asked "how it felt to be dead." The victim thought that she was going to die.

Appellant then pointed the gun at himself and threatened to kill himself.

During the course of this ordeal, Kelly Wardell, the individual who was supposed to go to California with Appellant, stopped by to see if Appellant was still planning to make the trip. Appellant made the victim wait in the bathroom while he talked to Mr. Wardell. Rather than inviting Mr. Wardell inside the house to talk, Appellant told him through the bedroom window that he could not make the trip to California because he was having an argument with "his wife." The victim tried to escape through the bathroom window while Appellant was talking to Mr. Wardell; however, Appellant pulled her away before she could get through the window.

Appellant eventually started to calm down and laid the gun on the kitchen table. The victim saw this as an opportunity to escape. She picked up the gun and told Appellant that she was leaving. She was near the door when Appellant went after her, telling her that she was a "dead bitch." Appellant was trying to take the gun away from the victim when she shot him in the leg. The victim later told two police officers that she shot Appellant in the leg because she did not know how else to stop him. Appellant was charged with kidnapping in violation of § 6–2–201(a)(iii) and aggravated assault and battery in violation of Wyo.Stat. § 6–2–502(a)(iii) (1988). The jury was also instructed on the lesser offenses of felonious restraint and false imprisonment as well as reckless endangering and simple assault and battery. The jury found Appellant guilty of kidnapping and simple battery.

■ Appellant's first contention on appeal is that the evidence was insufficient to support a finding that he unlawfully confined the victim within the meaning of Wyo.Stat. § 6–2–201 (1988). Section 6–2–201(a) provides:

(a) A person is guilty of kidnapping if he unlawfully removes another from his place of residence or business or from the vicinity where he was at the time of the removal, or if he unlawfully confines another person, with the intent to:

(i) Hold for ransom or reward, or as a shield or hostage;

(ii) Facilitate the commission of a felony; or

(iii) Inflict bodily injury on or to terrorize the victim or another.

Appellant begins his insufficiency-of-the-evidence claim by arguing that this Court should read additional language from the Model Penal Code into our kidnapping statute. To be guilty of kidnapping under the Model Penal Code, a defendant must "unlawfully confine[ ] another *for a substantial period in a place of isolation.*" Model Penal Code § 212.1 (emphasis added). Our statute establishes no durational requirement for the period of confinement.[1]

Appellant contends that, if the Court were to adopt the additional language found in the Model Penal Code, § 6–2–201 could properly be applied only in instances of severe criminal conduct. When drafting the Model Penal Code, the authors' intent was to restrict the drastic sanctions for kidnapping to only those instances of misbehavior which warrant such punishment. *Id.* at 220. One of the ways the Model Penal Code distinguished between kidnapping and trivial restraints or restraints incidental to other crimes was by requiring the confinement to be for a substantial period of time. *Id.* at 229. Appellant points out that this Court has previously found the Model Penal Code's purpose to be persuasive when interpreting our kidnapping statute. *Keene v. State,* 812 P.2d 147, 150–51 (Wyo.1991). Thus, to be consistent with the Model Penal Code's purpose of punishing for only severe crimes, we should read the "substantial period" language into § 6–2–201. According to Appellant, our failure to read the additional language into the

---

1. Appellant's claim focuses on the lack of sufficient evidence to support a finding of confinement. We note that the jury was instructed on and easily could have found Appellant guilty under the alternative theory that he unlawfully removed the victim "from the vicinity where [s]he was at the time of the removal" with the intent to inflict bodily injury on or to terrorize her.

statute would result in there being no difference between kidnapping and the lesser offenses of felonious restraint and false imprisonment. Appellant also claims that, in *Darrow v. State*, 824 P.2d 1269 (Wyo. 1992), we created a precedent of reading additional language into our kidnapping statute when we adopted that part of the Model Penal Code's provision concerning confinement which requires that a victim be placed in isolation. 824 P.2d at 1270.

Appellant's argument has some persuasive appeal; however, this Court's role is not to graft additional language onto a statute. Wyoming's Legislature adopted a kidnapping statute which is similar to the Model Penal Code's definition. The Legislature clearly chose not to adopt that part of the Model Penal Code's kidnapping definition which requires that the confinement be for a "substantial period in a place of isolation." When the Legislature has made such a clear decision regarding statutory language, it would be particularly inappropriate for this Court to interpret the Legislature's intent as being something other than what is plainly stated in the statute. The fact that in *Darrow* we interpreted our statute to include an isolation requirement like the Model Penal Code's requirement does not mean that we should also require confinement for a substantial period. *Darrow* presented this Court with the question of whether confinement could mean confinement within the victim's residence. To resolve that issue, we held that confinement means isolation from the "usual protections of society" and may include confinement within the victim's home. 824 P.2d at 1270. The question of what confinement meant was an ambiguity which we had to resolve. However, in contrast, there is no ambiguity surrounding whether a confinement must be for a substantial period because the Legislature deliberately chose not to adopt the "substantial period" language. Admittedly, by choosing not to adopt that language, the Legislature has opened the door for defendants in Wyoming to be charged with kidnapping for a much broader range of conduct than would be possible under the Model Penal Code. However, that was a choice for the Legislature, not for this Court.

We also cannot agree with Appellant that the broad language of § 6–2–201 goes so far as to nullify any distinction between kidnapping and felonious restraint or false imprisonment. Kidnapping requires confinement with the intent to hold for ransom, to facilitate the commission of a felony, or to inflict bodily injury on or to terrorize the victim or another. Felonious restraint involves an unlawful restraint which exposes the victim to a risk of serious bodily injury. Wyo.Stat. § 6–2–202 (1988). False imprisonment requires a knowing and unlawful interference with the victim's liberty. Wyo.Stat. § 6–2–203 (1988). Unlike felonious restraint or false imprisonment, kidnapping requires confinement with the intent to take one of three severe actions. By requiring not only confinement but also the additional intent to hold for ransom, to facilitate the commission of a felony, or to inflict bodily injury on or to terrorize the victim, the Legislature made kidnapping a much more serious crime which is easily distinguished from felonious restraint or false imprisonment.

In this case, sufficient evidence existed for the jury to find that Appellant unlawfully confined the victim within the meaning of § 6–2–201. When the victim attempted to get out of the pickup truck she was driving, Appellant forced her back into the truck. She was then coerced into remaining in the vehicle while Appellant drove around. Later, Appellant dragged the victim into his house where he forced her to remain until she escaped by shooting him. Further evidence of the fact that she was confined was her thwarted attempt to escape through the bathroom window. Appellant argues that the victim was not truly confined because several people were aware that she was in his house, either through telephone calls or by personal visits with him. What Appellant fails to point out is that, with the possible exception of Mr. Errington, none of the people who called his house or stopped by were aware that the victim was being held against her will. As to Mr. Errington, he either misjudged the gravity of the situation or would not interfere because he worked for Appellant. A reasonable jury could have

found from the evidence presented that the time the victim spent in the truck or in Appellant's house was sufficient to constitute confinement within the meaning of § 6–2–201.

Appellant also claims that insufficient evidence existed of his intent to inflict bodily injury on or to terrorize the victim. The focus of his claim is that the jury could not have found that Appellant intended to terrorize his victim. Appellant reasons that, because the counts against him for aggravated assault and battery and reckless endangering both required the use of a gun and the jury found him guilty of only simple battery, the jury must have thought that he did not threaten the victim with a gun. According to Appellant, if the jury found that he did not threaten the victim with a gun, he could not have terrorized her.

■ Appellant's claim contains several flaws. First, § 6–2–201 requires that the defendant confine the victim with the intent to inflict bodily injury on *or* to terrorize her. Appellant dismisses any injury to the victim as being incidental. However, a reasonable jury could have found sufficient evidence of Appellant's intent to inflict bodily injury on the victim when he struck her while she was in the pickup truck. The victim received two black eyes and a bloody nose as a result of Appellant striking her. Second, the jury could have found that Appellant's threats to kill the victim constituted terrorizing, even if they were not made with a gun. *Driskill v. State,* 761 P.2d 980, 982–83 (Wyo.1988). Finally, even if we assume arguendo that Appellant needed to threaten the victim with the gun to constitute terrorizing, the jury's finding of guilt for simple battery and not for reckless endangering or aggravated assault and battery would not foreclose a finding of guilt on the kidnapping charge. In several instances, this Court has said that consistency in a jury's verdict is not necessary. *Eatherton v. State,* 810 P.2d 93, 98 (Wyo.1991); *Lessard v. State,* 719 P.2d 227, 230–32 (Wyo.1986). Professor Wright states the rule in his treatise as follows:

> In a case in which there are multiple counts, each one is treated as if it were a separate indictment. The verdict on the various counts need not be consistent. An acquittal on one count does not prevent conviction on another, even though the evidence is the same and defendant could not have committed one crime without committing both, so long as the evidence is sufficient to support conviction on the count on which a guilty verdict was reached.

3 Charles Alan Wright, Federal Practice and Procedure § 514 at 14–16 (1982).

This case does not fit neatly within the general rule because Appellant was convicted for both kidnapping and simple battery. His acquittal on the offenses of aggravated assault and battery and reckless endangering was only implied. However, other courts have applied the rule that consistency is not required when one of the convictions is for a lesser offense rather than for the offense originally charged and it is argued that an implied acquittal is inconsistent with the remaining count. Annotation, *Inconsistency of Criminal Verdict as Between Different Counts of Indictment or Information,* 18 A.L.R.3d 259 at § 5 (1968); *People v. Witzel,* 155 Cal. App.2d 486, 318 P.2d 136 (1957). We agree with this view. The fact that Appellant's acquittal on the greater offenses was implied rather than explicit should not alter the general rule concerning inconsistent verdicts. Thus, even if Appellant's use of a gun had been necessary for a conviction, the jury's finding of guilt on the charge of simple battery rather than aggravated assault and battery or reckless endangering does not present a problem.

The final question we must address is whether mitigating factors were present which require that Appellant be resentenced. Section 6–2–201(c) states: "If the defendant voluntarily releases the victim substantially unharmed and in a safe place prior to trial, kidnapping is a felony punishable by imprisonment for not more than twenty (20) years." If the defendant fails to establish any one of the four elements contained in subsection (c), his crime becomes punishable by imprisonment for not less than twenty years. Section 6–2–201(d); *Loomer v. State,* 768 P.2d 1042, 1046–47 (Wyo.1989).

408

■ The first mitigating factor to be considered is whether Appellant voluntarily released his victim. Appellant claims that he voluntarily released the victim when he allowed her to possess the gun. A reasonable jury could have concluded from the evidence presented that Appellant did not "allow" the victim to obtain possession of the gun and that he did not voluntarily release her. According to the victim, Appellant left the gun on the kitchen table. She picked up the gun and started walking toward the door. When she told Appellant that she was leaving, he jumped up, saying, " 'No, you're not,' " and telling her that she was a "dead bitch." Appellant went after the victim and was trying to take the gun away from her when she shot him in the leg. By telling her that she was not leaving and by trying to take the gun away from her, Appellant certainly did not voluntarily release the victim. Because the record contained sufficient evidence showing that Appellant did not release his victim voluntarily, we do not need to consider whether he released her substantially unharmed, in a safe place, or prior to trial.

Affirmed.